UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X

DR. HUIAI YANG,

                Plaintiff,                        **AMENDED COMPLAINT**
                                                                 **AND JURY DEMAND**

  -against-

                                                                 **14-CIV-07037 (SLT)(RLM)**

THE DEPARTMENT OF EDUCATION
OF THE CITY OF NEW YORK, AND THE
BOARD OF EDUCATION OF THE CITY

              Defendant,
---------------------------------------------------------------X

## AMENDED COMPLAINT AND JURY DEMAND

### I.   PRELIMINARY STATEMENT

    1.   This is a civil action based upon Defendants' violations of the Title VII of the Civil Rights Act ("Title VII), 42 U.S.C. 2000 er. seq. by discriminating against Plaintiff due to her national origin (Chinese) and by subjecting Plaintiff to a hostile work environment.
This action seeks declaratory, equitable relief, compensatory damages, costs and attorney fees.

### II.   JURISDICTION AND VENUE

    2.   Plaintiff has commenced this action pursuant to the Title VII. At all relevant times, Defendant is an "employer" as defined in Section 701(b) of Title VII of the Civil Rights Act of 1964 42 U.S.C. § 2000e.   Plaintiff filed EEOC charges under national origin discrimination and a notice of right to sue letter was received within ninety days of the filing of this lawsuit conferring jurisdiction.

3. This action was originally filed in the New York Supreme Court, County of Kings which had concurrent jurisdiction, and the Defendant removed it to this Court pursuant to 28 U.S.C.§ 1441(a).

### III. THE PARTIES

4. Plaintiff is an employee and individual within the meaning of Title VII of the Civil Rights Act of 1964 42 U.S.C.§2000e. and was employed as a school psychologist for P198M/77M/721M since 2009.

5. Defendants the Department of Education of the City of New York, the City School District of the City of New York and the Board of Education of the City School District of New York (hereinafter "Defendant") are charged by law with responsibility for the operation, management and control of the New York City public education and are "employers" as defined in Section 701(b) of Title VII of the Civil Rights Act of 1964 42 U.S.C. § 2000e.

### IV. FACTUAL STATEMENT

6. Plaintiff DR. HUIAI YANG, (Chinese born) was School Psychologist for P198M/77M/721M since 2009.

7. Plaintiff was discriminated against due to her national origin.

8. On Monday and Tuesday, Plaintiff worked at P721M, which is a District 75 specialized school for high school students. The rest of the week Plaintiff worked at P198M/77M. P198M was Plaintiff's payroll school and Principal Roebuck was her rating officer for the year 2009, 2010, 2011 but not Principal Nancy Emerick.

6. Plaintiff received 5 unsatisfactory observational reports (dated 12/9/2011, 3/22/2012, 12/14/2012, 1/24/2013) for the school years 2011-2012 and 2012-2013. Dr.

2

Fleishman (Jewish Caucasian), who wrote 4 out of these 5 reports was Plaintiff's psychologist supervisor for the P721M school from 2009 to 2011.

7. Dr. Fleishman initially started to observe Dr. Yang after Dr. Fleishman became the school psychologist supervisor for P77M in 2011.

8. Dr. Yang was subjected to disparate treatment and a hostile work environment as set forth below which in turn caused her termination.

9. Dr. Yang was employed at three schools as a school psychologist and received three satisfactory evaluations. However, in June 2013, Dr. Yang received an unsatisfactory annual review and her probationary status was discontinued.

10. Dr. Fleishman (Jewish Caucasian) made frequent comments about Plaintiff's accent in a derogatory and humiliating manner. For instance every time Dr. Fleishman would have a conversation with Plaintiff, she will end up her sentences by saying to Plaintiff "…it's because you are Chinese". At meetings and in front of other colleagues Dr. Fleishman would constantly interrupt Plaintiff to point out the fact that Plaintiff has an accent and would tell her "Say it louder!" and "…it's because you are Chinese" . These comments were uttered to Plaintiff on a frequent basis.

11. More specifically, every time Plaintiff would see Dr. Fleishman, she would always made Plaintiff ashamed of the way she spoke English due to her remarks "it's because you are Chinese". For instance, after Dr. Fleishmen became the school psychologist supervisor for P77M, she asked Plaintiff to attend her biweekly meeting for first-year clinicians; Plaintiff was in her third year as a school psychologist. During those meetings, Dr. Fleishmen interrupted Plaintiff constantly every time she spoke and did this on purpose in order to embarrass Plaintiff

3

and cast her as someone who spoke with a heavy accent and who could not be understood without constant repetition. Plaintiff attended these meetings for over a year and was humiliated. There were other school psychologists present.

12. Moreover, on or about March 22, 2012, Plaintiff received the second unsatisfactory report from Dr. Fleishman. Plaintiff was then asked to go to Dr. Fleishman's office on the 7th Avenue DOE building and go through her feedback with her. During that meeting, where only Dr. Fleishman and Plaintiff were present, Dr. Fleishman was rude and very impatient. She frequently asked Plaintiff to repeat what she said. On Plaintiff's psychological report, Dr. Fleishman specifically pointed out one sentence and indicated that it was written in poorly. Plaintiff said to her that she misread Plaintiff's sentence and thus Dr. Fleishman reread it again and y it must be the English that Plaintiff used that caused her to misunderstand.

13. In addition, Plaintiff was subjected to intentional, continuous conduct (a continuing violation) that subjected Plaintiff to disparate treatment and a hostile work environment due to her Chinese national origin that caused her termination to wit:

    a. Plaintiff was subjected to micro management and microscopic scrutiny on a daily basis;

    b. Plaintiff was assigned the most difficult students.

    c. Plaintiff's case load was greater than other non-Chinese school psychologist.

    d. Plaintiff was harassed in an effort to force her to resign;

    e. Plaintiff was subjected to demeaning and discriminatory comments;

    f. Plaintiff received biased memos, letters to the file and discipline;

4

      g.      Plaintiff was subjected to biased investigations;

      h.      False accusations were asserted against Plaintiff;

      i.      Plaintiff did not receive the same level of support as other non-Chinese school psychologist;

      j.      Plaintiff was treated differently regarding professional development

      k.      Plaintiff received biased observations

      l.      Plaintiff received a biased annual performance review;

      m.      Plaintiff's probationary status was discontinued;

      n.      Other acts of discrimination.

14. For instance, in the beginning of the second school year (2011-2012) Plaintiff worked for P198M and P77M. Dr. Koetke (Caucasian) turned the room next to Plaintiff's office into a music class for the Gifted and Talented students of P77M despite knowing that Plaintiff did all her evaluations and IEP meetings at her office. On or about September 2010, Plaintiff complained to Dr. Koetke regarding this arrangement but nothing was done.

15. Further, there were two psychologists serving P198M and P77M who were Dr. Rosen (Jewish Caucasian) and Dr. Yang (Chinese). It is the other full time psychologist's responsibility to divide all the cases for both schools between the psychologists. However, the cases were not immediately assigned to. Belatedly, Dr. Koetke purposely assigned the hardest cases to Plaintiff and she had Dr. Fleishman observed Plaintiff (see reports dated 12/9/2011, 1/24/2013) only on the most difficult cases. Dr. Fleishman would even observe Plaintiff even if she was not the supervisor at the particular school.

16. Dr. Koetke would also require Plaintiff work outside her job responsibilities. For

5

instance, Plaintiff was asked by Dr. Koetke to be an interpreter because she had some Chinese guests visiting the school one day. Plaintiff told Dr. Koetke that she could not do this because she needed to prepare for her IEP meetings.

17. Plaintiff was also subjected to biased discipline. For instance, on or about November 04, 2011 (a day before Plaintiff's formal observation) Plaintiff was disciplined in a bias manner by Dr. Fleishman (School Psychology Supervisor for P77M) and Dr. Koetke (Principal of P77M) and was written up and held as the sole person who was responsible for providing a parent with a copy of the Procedural Safeguards. In reality, the social worker should share the responsibility, not school psychologist alone. However, the social worker Iris Lugo-Becker (Hispanic, Puerto Rican) as well as Assistant Principal Nancy Emerick (Hispanic, Puerto Rican) were not disciplined. More specifically, on that day, Dr. Koetke sent her parent coordinator down to Plaintiff's office and asked for a copy of Procedural Safeguards. At that time Dr. Koetke's family associate, Susan Roth, stated that she did not have a copy at hand. Plaintiff suggested to her to see whether the social worker had it. Thereafter, Plaintiff was disciplined for not providing the sheet and this incident was grossly distorted in a letter accusing Plaintiff of being ignorant of basic federal, state and city guidelines regarding the protection of parent's rights, having a lack of team play, and cooperation.

18. Shortly after this incident, on or about December 09, 2011 Dr. Fleishman indicated that she would like to observe Plaintiff at the Educational Planning Conference (EPC). Dr. Fleishman also indicated to Plaintiff that she would also observe Plaintiff's colleague Dr. Ronna Rosen; however this was not done and Plaintiff was the only one observed. Dr. Fleishman and Dr. Rosen share the same ethnicity. At the conference, Dr. Fleishman humiliated Plaintiff in front

6

of all her colleagues. This observation resulted in a "U" rating (dated 12/9/2011) because Dr. Yang was casted as incompetent.

19. In addition, Plaintiff even though Plaintiff worked part-time, she was given the highest amount of cases (more or about the same as the other non-Chinese school psychologist who worked full time) and the most difficult ones. For instance, around the same time, a first grader student (E.L.) from P198M, came to the school and he was not taking his medication. E.L. had ADHD, and was also developmentally delayed. Plaintiff therefore recommended a special class for him. According to the placement officer due to this recommendation E.L. was transferred from P198M to P77M. Plaintiff did not know a SESIS glitch wiped out her recommendation on the IEP until she received a letter falsely accusing her of having a lack of diligence and thus causing E.L.'s placement in jeopardy.

20. Another student (J.J.) was to be under three year mandated evaluations from P77. One day shortly after Plaintiff completed J.J.'s case and his IEP was finalized, the special education teacher came to Plaintiff's office and insisted that Plaintiff change his IEP from Standard Assessment to Alternate Assessment. Plaintiff explained to her that J.J. was not qualified for Alternate Assessment. Plaintiff even showed the special education teacher the section on IEP where Alternate Assessment can be checked and went over the three questions they asked to determine whether a student is qualified for alternate assessment. At the end, the special education teacher said to Plaintiff to just do it because this is Dr. Koetke's recommendation. Plaintiff was written up again by Dr. Fleishman on this incident.

21. The last observation for school year 2011-2012 was conducted by Dr. Fleishman on one of Plaintiff's P198 initial cases: H.L., a kindergartner. This time Dr. Fleishman not only

7

observed Plaintiff's EPC meeting, but also went through all her evaluation protocols and her psycho-educational report. The observation report she wrote dated 3/22/2012 was full of erroneous information. For example, Dr. Fleishman noted that Plaintiff allegedly made a mistake in that "Dr. Yang indicated H.L.'s academic difficulties could be attributed to her slow processing speed. Yet her WPPSI-III processing speed was average, and her greatest cognitive strength". Conversely, the actual sentence on Plaintiff's report was "H.L presents as an overall slow learner, she needs more time to process the information she receives auditorily". The Processing Speed sub-domain of the IQ tests, as Plaintiff wrote in her report, provided an estimate of an individual's ability to quickly and correctly scan, sequence, and discriminate simple visual information. In other words, Plaintiff indicated that H.L is a visual learner and that she exhibited auditory processing issues. When Plaintiff pointed out the actual sentence on her report to Dr. Fleishman, it was indicated by Fleishman that the misunderstanding was due to Plaintiff's poor English. Dr. Fleishman further stated that 99.9% of people are visual learners, so that there was no point for Plaintiff to mention that in her psycho-educational report at all. In addition, Fleishman wrote that Plaintiff inappropriately wrote H.L's IEP goals in the report. Ironically, the IEP goals Plaintiff wrote for H.L. were based on the links Dr. Fleishman later sent to help the school psychologist developing the IEP goals.

22. Another "U" rating was given based on an evaluation done on another third grade student named A.S. from P77. Dr. Yang did the initial evaluation; however, this was a re-evaluation to add counseling and speech/language services. The student was diagnosed with ADHD. Dr. Fleishman gave Plaintiff a "U" rating because Plaintiff allegedly "failed to incorporated the basic suggestions to have meeting participants introduce themselves...unable to

8

direct the meeting or control it...relevant documents were not finalized in a timely fashion." This was patently false. On the contrary, Plaintiff's efforts made the meeting efficient and smooth. Everybody who came to the meeting had a very clear picture of the purpose of meeting and how to proceed except Dr. Fleishman. As for finalizing the IEP, Plaintiff's main concern was the IEP should be completed before finalizing it. The participants should have put their pieces in before Plaintiff could finalize the IEP. To finalize an incomplete IEP will ultimately invalidate that IEP.

23. The second unsatisfactory observation by Dr. Fleishman came about a month later and was based on a fifth grader student named S.C. Plaintiff was not informed of the observation until that day. As a result, Plaintiff did not have a chance to brief Dr. Fleishman regarding what the case was about. Dr. Fleishman was the only person in the meeting without any prior knowledge and needed to be introduced to others present. She gave Plaintiff a "U" observation reiterating her previous comments regarding the lack of formal introduction of the participants and an opening statement of the referral question. Again, this was another false statement. Additionally, in her report she distorted Plaintiff's intention to stop S.C.'s negative behaviors to punish S.C. for misbehaving and thereafter Dr. Fleishman took credit upon herself as the first person in the meeting to bring up FBA and BIP. There were nine people at the meeting. They all knew S.C. needed an IEP with FBA and BIP, and that was exactly why they were there for: to brainstorm what could and should be put in the BIP so that S.C.'s behaviors could be monitored effectively both in school and at home. Dr. Fleishman "U" rating was biased and discriminatory.

24. The last "U" observation of the school year 2012-2013 came from Dr. Koeke herself. She assigned a case to Plaintiff, knowing that it was a very difficult case. The case was of J.S., a third grader attending the Gifted and Talented Class in P77. J.S. had been receiving outside

9

tutoring for over two years. The parents brought with them a very extensive neuropsychological evaluation conducted by an outside evaluator requesting the special education services. In the pre-conference with Dr. Koeke, Plaintiff explained to her that J.S. was not eligible to receive special education services based on the report provided by the parents. Dr. Koeke agreed. The challenge was how to deliver the message without upsetting the parents.  After an hour long meeting, the parents felt relieved even without recommending any service, because they knew the school can help J.S. by avenues other than mandated special education services and the school promised to keep a close eye on J.S.'s academic performance, providing intervention if the situation necessitated it.  Dr. Koeke gave Plaintiff a"U" rating by reiterating Dr. Fleishman's comment regarding Dr. Yang lack of formal introduction and by putting "at risk" services for J.S. which was false.

25.     The final overall "U" rating on Plaintiff's year-end Professional Performance Review for the school year 2012-2013, there were a total of 22 items divided into 3 categories. Out of 22 items Plaintiff only obtain 3 "S" in <u>Attendance and punctuality</u>, <u>Personal appearance</u> under Category "Personal and Professional Qualities", and <u>Relationship with other pupil personal workers</u> under Category "Interpersonal Relationship". However, on her previous year-end rating, she had an overall rating of "S" with 17 out of 22 items rated "Satisfactory". If one places these two end of year evaluations side to side, it would be easy to notice that within a year all 12 items under Category "SBST Activities" (School-Based Support Team), which were marked "S" the previous year, were now marked a "U" on this 2012-2013 year.   Above all, there was no evidence supporting Dr. Fleishman's and Dr. Koeke's "U" observations.   The "U" observations were given to Dr. Yang in an effort to paper her file and ultimately terminate her.

10

26. On or about January 15, 2013, Plaintiff refused to sign the observation report written by Dr. Fleishman. Plaintiff told her that she could not sign because it was not a fair observation and was discriminatory. The date of observation was December 14, 2012.

27. On or about March 08, 2013, Plaintiff refused to sign another observation report by Dr. Fleishman for the same reason. The date of this observation was January 24, 2013.

28. Since 2009 Plaintiff had worked for 3 schools (PS721M, PS198M, PS77M) where she worked consecutively with 5 principals and 4 school psychologist supervisors. Before Ms. Emerick became the Principal of PS 198M, she worked for Dr. Koeke as the Assistant Principal for PS77M. She terminated Plaintiff on her first year as the Principal of PS198M.

29. Furthermore, the cases Plaintiff had from PS77M composed less than 1% of Plaintiff's total caseload, because the school mainly is for Gifted and Talented students. Yet, Plaintiff was discriminated and terminated for pretextual reasons and upon false information written in her "U" rating sheets.

30. Plaintiff's "U" rating reports are factually false.

31. Furthermore, there were clearly differential treatments for the two psychologists serving P198M and P77M. Plaintiff and the other was Dr. Ronna Rosen, also a psychologist. Ms. Rosen, who is Jewish Caucasian, had clear preferential treatment. For instance, Rosen's office was used only by her and was bigger than Plaintiff's office. Plaintiff was put into a room that hosts all files from both schools for the students receiving special education services and the room was shared with her family worker, Plaintiff's family worker and a social worker. Ms. Rosen's office also had air-conditioner and Plaintiff's office that holds 4 people had none. In addition, on dates of fire drills Plaintiff was the only one assigned to hold doors for the students

11

and Rosen was never assigned this task. Rosen was also given less or the same amount of cases than Plaintiff even though Rosen worked full time and Plaintiff worked part time. Rosen was also given easier cases than Plaintiff.

32. As a consequence of Defendant's actions, Plaintiff was terminated while on probation.

33. Plaintiff was not given any professional development opportunities even though her performance was allegedly deficient.

34. Plaintiff was replaced by a non-Chinese psychologist

35. Due to the disparate treatment and the hostile work environment, the Defendants have denied Plaintiff equal terms, conditions and privileges of employment and terminated her employment based on her national origin in violation of Title VII of the Civil Rights Act of 1964 as amended.

36. As a result of defendant's actions, Plaintiff suffered and was damaged.

37. The above captioned conduct was done intentionally and was a continuous pattern of harassment that altered the conditions of Plaintiff's employment.

38. To the objective observer, the conditions created a hostile work environment.

39. Plaintiff has suffered significant psychological injury.

40. Based upon the foregoing, Plaintiff was subjected to a hostile work environment and disparate treatment by reason of her national origin.

41. Plaintiff was terminated due to her Chinese national origin.

### FIRST CLAIM FOR RELIEF

42. As a result of the foregoing, defendant violated Title VII, 42 U.S.C. 2000e et. seq.

subjecting plaintiff to discrimination due to her national origin.

## SECOND CLAIM FOR RELIEF

43. As a result of the foregoing, defendant violated Title VII, 42 U.S.C. 2000e et. seq. subjecting plaintiff to a hostile work environment.

## DEMAND FOR A JURY TRIAL

44. Plaintiff demands a trial by Jury of all issues and claims in this action.

## PRAYER FOR RELIEF

Plaintiff respectfully requests a judgment against Defendant as follows:

1. Judgment for all past salary owed;

2. Judgment for pain and suffering;

3. A declaration that Plaintiff has been discriminated against and reinstatement to the position she would have been in but for the discriminatory conduct.

4. A reasonable attorney fees plus the costs and disbursements of this lawsuit, and such additional relief as this Court may deem just and proper under the circumstances including but not limited to retroactive reinstatement with benefits.

Dated: New York, New York
       March 05, 2015

                                    Respectfully submitted,
                                    THE LAW OFFICES OF
                                    STEWART LEE KARLIN, PC

_S\ Stewart Lee Karlin_
STEWART LEE KARLIN, ESQ
Attorneys for Plaintiff
9 Murray Street, Suite 4W
New York, N.Y. 10007
(212) 792-9670
