# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

## Case No.: 14 Civ. 07037 (SLT) (RLM)

X----------------------------------------------------------------------------------X

### DR. HUIAI YANG

Plaintiff,

-against-

### THE DEPARTMENT OF EDUCATION OF THE CITY OF NEW YORK, AND THE BOARD OF EDUCATION OF THE CITY SCHOOL DISTRICT OF NEW YORK,

Defendant.

X----------------------------------------------------------------------------------X

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE AMENDED COMPLAINT

Respectfully submitted,

Law Offices of
Stewart Lee Karlin, P.C.


s/ STEWART LEE KARLIN
*Attorneys for Plaintiff*
9 Murray Street, Suite 4W
New York, New York 10007
(212) 792-9670

## TABLE OF CONTENTS

**Item**                                                                                                                    **Page**

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i-ii

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii-iv

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-9

    A.  Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

    B. Disparate Treatment and Hostile Work Environment . . . . . . . . . . . . . . . . . . . . . . . . 9

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-25

**POINT I**
THE COMPLAINT IS IN NO PART BARRED BY THE
STATUTE OF LIMITATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-12

    A. The Adverse Employment Action Occurred During the
       Limitation Period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

    B. Continuing Violation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-12

**POINT II**
PLAINTIFF HAS MET HER BURDEN IN ADEQUATELY
SETTING FORTH HER CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12-25

    A. Standard on a Motion to Dismiss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12-13

    B. Plaintiff Has Adequately Set Forth
       Her Discrimination Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13-25

       1.    Disparate Treatment Under Title VII . . . . . . . . . . . . . . . . . . . . . . . . . . 13-23

           a.    Inference of Discrimination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14-16

           b.    Plaintiff Identified Similarly Situated Comparators . . . . . . . . . . . . . . . 17-19

           c.    The Legitimate Business Reason Proffered by
              Defendant is Merely Pretext for Discriminaiton . . . . . . . . . . . . . . . . . 19-23

2.    Hostile Work Environment Claim Under Title VII  . . . . . . . . . . . . . . . . . . . 23-25

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

## TABLE OF AUTHORITIES

**Case**                                                                      Page

Ashcroft v. Iqbal,
    129 S.Ct. 1937 (2009)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12,13

Back v. Hastings on Hudson Union Free Sch. Dist.,
    365 F.3d 107, 123 (2d Cir. 2004). ;  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13,19

Daniels v. Essex Group, Inc.,
    937 F.2d 1264, 1273-74 (7th Cir. 1991);  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24,25

Ellison v. Brady,
    924 F.2d 872, 878 (9th Cir. 1991);  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

Harris v. Forklift Systems, Inc.,
    10 U. S. 17, 21;  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11,19

Henson v City of Dundee,
    682 F.2d 897, 904 (11th Cir. 1982)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

James v. N.Y. Racing Ass'n,
    233 F.3d 149, 153-54 (2d Cir. 2000);  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

National Railroad Passenger Corp. v. Morgan,
    122 S.Ct. 2061 (2002);  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10, 11

McDonnell Douglas Corp. v. Green,
    411 U.S.. 792, 802, 93 S.Ct 1817, 36 L.Ed.2d 668 (1973) . . . . . . . . . . . . . . . . . . . 12,19

Oncale v. Sundowner Offshore Services, Inc.,
    118 S. Ct. 998 (1998);  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

Rodgers v. Western-Southern Life Ins. Co.,
    12 F.3d 668, 674 (7th Cir. 1993);  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

Smith v. Kmart, supra,
    1996 WL 780490 at *8  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

Smith v. Northwest Financial Acceptance, Inc.,
    129 F.3d 1408, 1415 (10th Cir. 1997) ; . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

Steiner v. Showboat Operating Company,
    25 F.3d 1459, 1463 n.4. (9th Cir. 1994);  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

**Case**                                                                                              **Page**

United Air Lines v. Evans,
    431 U.S. 553, 14 FEP 1510 (1977); . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Vance v. Southern Bell Tel. & Tel. Co.,
    863 F.2d 1503, 1511 (11th Cir. 1989); . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Woods v. Graphic Communications, Union Local
    747, 925 F.2d 1195, 1201 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Waltman v. International Paper Co.,
    875 F.2d 468, 476 (5th Cir. 1989) ; . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

**Statutory Authority**

Fed. R. Civ. P. Rule 8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Title VII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 11

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
DR. HUIAI YANG,

                  Plaintiff,                     **14 CV 07037 (SLT)(RLM)**

    -against-

THE DEPARTMENT OF EDUCATION
OF THE CITY OF NEW YORK, AND THE
BOARD OF EDUCATION OF THE CITY
SCHOOL DISTRICT OF NEW YORK,

                  Defendant.
---------------------------------------------------------------X

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS THE AMENDED COMPLAINT**

**PRELIMINARY STATEMENT**

    Plaintiff submits this memorandum of law in opposition to Defendant's motion to dismiss.

**STATEMENT OF FACTS**

**A.**    **Background**

    Plaintiff DR. HUIAI YANG, (Chinese born) was School Psychologist for P198M/77M/721M

since 2009. (Amd. Cmp. ¶ 6).   On Monday and Tuesday, Plaintiff worked at P721M, which is a

District 75 specialized school for high school students. The rest of the week Plaintiff worked at

P198M/77M.  P198M was Plaintiff's payroll school and Principal Roebuck was her rating officer

for the year 2009, 2010, 2011 but not Principal Nancy Emerick.  (Amd. Cmp. ¶ 8)

**B.**    **Disparate Treatment and Hostile Work Environment**

    Plaintiff received 5 unsatisfactory observational reports (dated 12/9/2011, 3/22/2012,

12/14/2012, 1/24/2013) for the school years 2011-2012 and 2012-2013.  Dr. Fleishman (Jewish-

1

Caucasian), who wrote 4 out of these 5 reports was Plaintiff's psychologist supervisor for the P721M school from 2009 to 2011. (6*). Dr. Fleishman initially started to observe Dr. Yang after Dr. Fleishman became the school psychologist supervisor for P77M in 2011. (Amd. Cmp. ¶ 7*)

Dr. Yang was employed at three schools as a school psychologist and received three satisfactory evaluations. However, in June 2013, Dr. Yang received an unsatisfactory annual review and her probationary status was discontinued. (Amd. Cmp. ¶ 9)

Dr. Fleishman (Jewish Caucasian) made frequent comments about Plaintiff's accent in a derogatory and humiliating manner. For instance every time Dr. Fleishman would have a conversation with Plaintiff, she will end up her sentences by saying to Plaintiff "…it's because you are Chinese". At meetings and in front of other colleagues Dr. Fleishman would constantly interrupt Plaintiff to point out the fact that Plaintiff has an accent and would tell her "Say it louder!" and "…it's because you are Chinese" . These comments were uttered to Plaintiff on a frequent basis. (Amd. Cmp. ¶ 10)

More specifically, every time Plaintiff would see Dr. Fleishman, she would always made Plaintiff ashamed of the way she spoke English due to her remarks "it's because you are Chinese". For instance, after Dr. Fleishman became the school psychologist supervisor for P77M, she asked Plaintiff to attend her biweekly meeting for first-year clinicians; Plaintiff was in her third year as a school psychologist. During those meetings, Dr. Fleishmen interrupted Plaintiff constantly every time she spoke and did this on purpose in order to embarrass Plaintiff and cast her as someone who spoke with a heavy accent and who could not be understood without constant repetition. Plaintiff attended these meetings for over a year and was humiliated. There were other school psychologists present. (Amd. Cmp. ¶ 11)

2

Moreover, on or about March 22, 2012, Plaintiff received the second unsatisfactory report from Dr. Fleishman. Plaintiff was then asked to go to Dr. Fleishman's office on the 7th Avenue DOE building and go through her feedback with her. During that meeting, where only Dr. Fleishman and Plaintiff were present, Dr. Fleishman was rude and very impatient. She frequently asked Plaintiff to repeat what she said. On Plaintiff's psychological report, Dr. Fleishman specifically pointed out one sentence and indicated that it was poorly written. Plaintiff said to her that she misread Plaintiff's sentence and thus Dr. Fleishman reread it again. (Amd. Cmp. ¶ 12)

In addition, Plaintiff was subjected to intentional, continuous conduct (a continuing violation) that subjected Plaintiff to disparate treatment and a hostile work environment due to her Chinese national origin that caused her termination to wit:

  a. Plaintiff was subjected to micro management and microscopic scrutiny on a daily basis;

  b. Plaintiff was assigned the most difficult students.

  c. Plaintiff's case load was greater than other non-Chinese school psychologist.

  d. Plaintiff was harassed in an effort to force her to resign;

  e. Plaintiff was subjected to demeaning and discriminatory comments;

  f. Plaintiff received biased memos, letters to the file and discipline;

  g. Plaintiff was subjected to biased investigations;

  h. False accusations were asserted against Plaintiff;

  i. Plaintiff did not receive the same level of support as other non-Chinese school psychologist;

  j. Plaintiff was treated differently regarding professional development

3

      k.      Plaintiff received biased observations

      l.      Plaintiff received a biased annual performance review;

      m.     Plaintiff's probationary status was discontinued;

      n.      Other acts of discrimination.  (Amd. Cmp. ¶ 13)

For instance, in the beginning of the second school year (2011-2012) Plaintiff worked for P198M and P77M.  Dr. Koetke (Caucasian) turned the room next to Plaintiff's office into a music class for the Gifted and Talented students of P77M despite knowing that Plaintiff did all her evaluations and IEP meetings at her office. On or about September 2010, Plaintiff complained to Dr. Koetke regarding this arrangement but nothing was done.  (Amd. Cmp. ¶ 14)

Further, there were two psychologists serving P198M and P77M who were Dr. Rosen (Jewish Caucasian) and Dr. Yang (Chinese). It is the other full time psychologist's responsibility to divide all the cases for both schools between the psychologists. However, the cases were not immediately assigned to. Belatedly, Dr. Koetke purposely assigned the hardest cases to Plaintiff and she had Dr. Fleishman observe Plaintiff (see reports dated 12/9/2011, 1/24/2013) only on the most difficult cases. Dr. Fleishman would even observe Plaintiff even if she was not the supervisor at the particular school.  (Amd. Cmp. ¶ 15)

Dr. Koetke would also required Plaintiff work outside her job responsibilities.  For instance, Plaintiff was asked by Dr. Koetke to be an interpreter because she had some Chinese guests visiting the school one day.  Plaintiff told Dr. Koetke that she could not do this because she needed to prepare for her IEP meetings.  (Amd. Cmp. ¶ 16)

Plaintiff was also subjected to biased discipline.  For instance, on or about November 04, 2011 (a day before Plaintiff's formal observation) Plaintiff was disciplined in a biased manner by

4

Dr. Fleishman (School Psychology Supervisor for P77M) and Dr. Koetke (Principal of P77M) and was written up and held as the sole person who was responsible for providing a parent with a copy of the Procedural Safeguards. In reality, the social worker should share the responsibility, not school psychologist alone. However, the social worker Iris Lugo-Becker (Hispanic, Puerto Rican) as well as Assistant Principal Nancy Emerick (Hispanic, Puerto Rican) were not disciplined. More specifically, on that day, Dr. Koetke sent her parent coordinator down to Plaintiff's office and asked for a copy of Procedural Safeguards. At that time, Dr. Koetke's family associate, Susan Roth, stated that she did not have a copy at hand. Plaintiff suggested to her to see whether the social worker had it. Thereafter, Plaintiff was disciplined for not providing the sheet and this incident was grossly distorted in a letter accusing Plaintiff of being ignorant of basic federal, state and city guidelines regarding the protection of parent's rights, having a lack of team play, and cooperation. (Amd. Cmp. ¶ 17)

Shortly after this incident, on or about December 09, 2011 Dr. Fleishman indicated that she would like to observe Plaintiff at the Educational Planning Conference (EPC). Dr. Fleishman also indicated to Plaintiff that she would also observe Plaintiff's colleague Dr. Ronna Rosen; however this was not done and Plaintiff was the only one observed. Dr. Fleishman and Dr. Rosen share the same ethnicity. At the conference, Dr. Fleishman humiliated Plaintiff in front of all her colleagues. This observation resulted in a "U" rating (dated 12/9/2011) because Dr. Yang was casted as incompetent. (Amd. Cmp. ¶ 18)

In addition, Plaintiff, even though she worked part-time, was given the highest amount of cases (more or about the same as the other non-Chinese school psychologist who worked full time) and the most difficult ones. For instance, around the same time, a first grader student (E.L.) from

5

P198M, came to the school and he was not taking his medication.  E.L. had ADHD, and was also developmentally delayed. Plaintiff therefore recommended a special class for him. According to the placement officer due to this recommendation E.L. was transferred from P198M to P77M.  Plaintiff did not know a SESIS glitch wiped out her recommendation on the IEP until she received a letter falsely accusing her of having a lack of diligence and thus causing E.L.'s placement in jeopardy. (Amd. Cmp. ¶ 19)

Another student (J.J.) was to be under three year mandated evaluations from P77. One day shortly after Plaintiff completed J.J.'s case and his IEP was finalized, the special education teacher came to Plaintiff's office and insisted that Plaintiff change his IEP from Standard Assessment to Alternate Assessment.  Plaintiff explained to her that J.J. was not qualified for Alternate Assessment. Plaintiff even showed the special education teacher the section on IEP where Alternate Assessment can be checked and went over the three questions they asked to determine whether a student is qualified for alternate assessment. At the end, the special education teacher said to Plaintiff to just do it because this is Dr. Koetke's recommendation. Plaintiff was written up again by Dr. Fleishman on this incident.  (Amd. Cmp. ¶ 20)

The last observation for school year 2011-2012 was conducted by Dr. Fleishman on one of Plaintiff's P198 initial cases: H.L., a kindergartner. This time Dr. Fleishman not only observed Plaintiff's EPC meeting, but also went through all her evaluation protocols and her psycho-educational report.   The observation report she wrote dated 3/22/2012 was full of erroneous information.  For example, Dr. Fleishman noted that Plaintiff allegedly made a mistake in that "Dr. Yang indicated H.L.'s academic difficulties could be attributed to her slow processing speed. Yet her WPPSI-III processing speed was average, and her greatest cognitive strength". Conversely, the

actual sentence on Plaintiff's report was "H.L presents as an overall slow learner, she needs more time to process the information she receives auditorily". The Processing Speed sub-domain of the IQ tests, as Plaintiff wrote in her report, provided an estimate of an individual's ability to quickly and correctly scan, sequence, and discriminate simple visual information. (Amd. Cmp. ¶ 21)

In other words, Plaintiff indicated that H.L is a visual learner and that she exhibited auditory processing issues. When Plaintiff pointed out the actual sentence on her report to Dr. Fleishman, it was indicated by Fleishman that the misunderstanding was due to Plaintiff's poor English. Dr. Fleishman further stated that 99.9% of people are visual learners, so that there was no point for Plaintiff to mention that in her psycho-educational report at all. In addition, Fleishman wrote that Plaintiff inappropriately wrote H.L's IEP goals in the report. Ironically, the IEP goals Plaintiff wrote for H.L. were based on the links Dr. Fleishman later sent to help the school psychologist developing the IEP goals. (Amd. Cmp. ¶ 21)

Another "U" rating was given based on an evaluation done on another third grade student named A.S. from P77. Dr. Yang did the initial evaluation; however, this was a re-evaluation to add counseling and speech/language services. The student was diagnosed with ADHD. Dr. Fleishman gave Plaintiff a "U" rating because Plaintiff allegedly "failed to incorporated the basic suggestions to have meeting participants introduce themselves...unable to direct the meeting or control it...relevant documents were not finalized in a timely fashion." This was patently false. On the contrary, Plaintiff's efforts made the meeting efficient and smooth. Everybody who came to the meeting had a very clear picture of the purpose of meeting and how to proceed except Dr. Fleishman. As for finalizing the IEP, Plaintiff's main concern was the IEP should be completed before finalizing

7

it. The participants should have put their pieces in before Plaintiff could finalize the IEP. To finalize

an incomplete IEP will ultimately invalidate that IEP. (Amd. Cmp. ¶ 22)

The second unsatisfactory observation by Dr. Fleishman came about a month later and was

based on a fifth grader student named S.C. Plaintiff was not informed of the observation until that

day. As a result, Plaintiff did not have a chance to brief Dr. Fleishman regarding what the case was

about. Dr. Fleishman was the only person in the meeting without any prior knowledge and needed

to be introduced to others present. She gave Plaintiff a "U" observation reiterating her previous

comments regarding the lack of formal introduction of the participants and an opening statement of

the referral question. Again, this was another false statement. Additionally, in her report she

distorted Plaintiff's intention to stop S.C.'s negative behaviors to punish S.C. for misbehaving and

thereafter Dr. Fleishman took credit upon herself as the first person in the meeting to bring up FBA

and BIP. There were nine people at the meeting. They all knew S.C. needed an IEP with FBA and

BIP, and that was exactly why they were there for: to brainstorm what could and should be put in the

BIP so that S.C.'s behaviors could be monitored effectively both in school and at home. Dr.

Fleishman "U" rating was biased and discriminatory. (Amd. Cmp. ¶ 23)

The last "U" observation of the school year 2012-2013 came from Dr. Koeke herself. She

assigned a case to Plaintiff, knowing that it was a very difficult case. The case was of J.S., a third

grader attending the Gifted and Talented Class in P77. J.S. had been receiving outside tutoring for

over two years. The parents brought with them a very extensive neuropsychological evaluation

conducted by an outside evaluator requesting the special education services. In the pre-conference

with Dr. Koeke, Plaintiff explained to her that J.S. was not eligible to receive special education

services based on the report provided by the parents. Dr. Koeke agreed. The challenge was how to deliver the message without upsetting the parents. After an hour long meeting, the parents felt relieved even without recommending any service, because they knew the school can help J.S. by avenues other than mandated special education services and the school promised to keep a close eye on J.S.'s academic performance, providing intervention if the situation necessitated it. Dr. Koeke gave Plaintiff a "U" rating by reiterating Dr. Fleishman's comment regarding Dr. Yang lack of formal introduction and by putting "at risk" services for J.S. which was false. (Amd. Cmp. ¶ 24).

The final overall "U" rating on Plaintiff's year-end Professional Performance Review for the school year 2012-2013, there were a total of 22 items divided into 3 categories. Out of 22 items Plaintiff only obtain 3 "S" in Attendance and punctuality, Personal appearance under Category "Personal and Professional Qualities", and Relationship with other pupil personal workers under Category "Interpersonal Relationship". However, on her previous year-end rating, she had an overall rating of "S" with 17 out of 22 items rated "Satisfactory". If one places these two end of year evaluations side to side, it would be easy to notice that within a year all 12 items under Category "SBST Activities" (School-Based Support Team), which were marked "S" the previous year, were now marked a "U" on this 2012-2013 year. Above all, there was no evidence supporting Dr. Fleishman's and Dr. Koeke's "U" observations. The "U" observations were given to Dr. Yang in an effort to paper her file and ultimately terminate her. (Amd. Cmp. ¶ 25).

On or about January 15, 2013, Plaintiff refused to sign the observation report written by Dr. Fleishman. Plaintiff told her that she could not sign because it was not a fair observation and was discriminatory. The date of observation was December 14, 2012. (26). On or about March 08, 2013,

Plaintiff refused to sign another observation report by Dr. Fleishman for the same reason. The date of this observation was January 24, 2013. (Amd. Cmp. ¶ 27).

## ARGUMENT

## POINT I

## THE COMPLAINT IS IN NO PART BARRED BY THE STATUTE OF LIMITATIONS

**A.     The Adverse Employment Action Occurred During the Limitations Period**

Title VII claims must be filed with the EEOC within 300 days of the alleged act of discrimination in order to be timely. As acknowledged by Defendant, Plaintiff's EEOC charge of discrimination was filed on December 23, 2013, thus making all claims accruing on February 26, 2013 or later, timely. (*See* Def.'s Ex. "A"). There is no dispute that the adverse employment action suffered by Plaintiff, the termination of her probationary employment in June 2013, is timely. (Amd. Cmp. ¶ 9). In addition, the other allegations set forth by Plaintiff are timely, as she has clearly alleged that she was set subjected to a continuing violation as set forth below.

**B.     Continuing Violation**

The Supreme Court has stated that as long as a continuing violation exists, a plaintiff should be allowed to prove that she was subjected to a hostile work environment. See National Railroad Passenger Corp. v. Morgan, 122 S.Ct. 2061 (2002). Therefore, plaintiff's claims cannot be barred because she is still subject to a present and continuing hostile work environment. The leading cases with regards to a "continuing violation" alleged by an employment discrimination plaintiff are National Railroad Passenger Corp. v. Morgan, 122 S.Ct. 2061 (2002) and United Air Lines v. Evans, 431 U.S. 553, 14 FEP 1510 (1977). In Evans, Justice Stevens stated that past discriminatory

acts which are not themselves the basis of timely charges of discrimination by the plaintiff nevertheless ". . . may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue. . ." In <u>Morgan</u>, the Court stated that hostile work environment claims are different in kind from discrete acts. Because their very nature involves repeated conduct, the "unlawful employment practice," §2000e-5(e)(1), cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own. *See* <u>Harris v. Forklift Systems, Inc.</u>, 10 U. S. 17, 21.

In the present case the actions taken by Defendants in discrimination and retaliation against Plaintiff are of the type that have been continuing in nature, as far back as the start of the 2011-2012 school year. Plaintiff was subjected to intentional, continuous conduct (a continuing violation) that subjected Plaintiff to disparate treatment and a hostile work environment due to her Chinese national origin that caused her termination to wit:

- a. Plaintiff was subjected to micro management and microscopic scrutiny on a daily basis;
- b. Plaintiff was assigned the most difficult students.
- c. Plaintiff's case load was greater than other non-Chinese school psychologist.
- d. Plaintiff was harassed in an effort to force her to resign;
- e. Plaintiff was subjected to demeaning and discriminatory comments;
- f. Plaintiff received biased memos, letters to the file and discipline;
- g. Plaintiff was subjected to biased investigations;
- h. False accusations were asserted against Plaintiff;

i.      Plaintiff did not receive the same level of support as other non-Chinese

school psychologist;

j.      Plaintiff was treated differently regarding professional development

k.      Plaintiff received biased observations

l.      Plaintiff received a biased annual performance review;

m.      Plaintiff's probationary status was discontinued;

n.      Other acts of discrimination.  (Amd. Cmp. ¶ 13)

The details of this continued discrimination and harassment is set forth at length above in

Plaintiff's "Statement of Facts" as well as below in "Point II- Hostile Work Environment."  The

allegations set forth by Plaintiff, when viewed under the appropriate standard on a motion to dismiss,

clearly give rise to a continuing violation, and thus all of the allegations set forth are timely.

## POINT II

### PLAINTIFF HAS MET HER BURDEN IN
### <u>ADEQUATELY SETTING FORTH HER CLAIMS</u>

**A.      Standard on a Motion to Dismiss**

In <u>Ashcroft v. Iqbal</u>, 129 S.Ct. 1937 (2009) the court clarified the standards regarding a

motion to dismiss.  A complaint that survives a motion to dismiss must set forth enough factual

basis (taken as true) to suggest real plausibility that the plaintiff's claims are true. The Court

should  differentiate pleadings of fact, which are entitled to a presumption of the truth, from

pleadings of conclusion.  The second prong requires that "only a complaint that states a plausible

claim for relief. Id. at 1950. The Court explained that the "plausibility" required by Fed. R. Civ.

P. Rule 8 requires a complaint must contain a "short and plain statement of the claim showing

that the pleader is entitled to relief. Further any attempt to convert this motion into a quasi summary judgment motion should rejected and the Court should not consider any evidence submitted by Defendant as improper under the Federal Rules.

**B.      Plaintiff Has Adequately Set Forth Her Discrimination Claims**

Plaintiff's Amended Complaint has set forth claims against the Defendants for discrimination, both disparate treatment and a hostile work environment in violation of Title VII.

**(1)      Disparate Treatment under Title VII**

To establish a prima facie case of race discrimination under Title VII, a plaintiff must show that: (1) she is a member of a protected class; (2) she was qualified for his position; (3) she suffered and adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination. McDonnell Douglas Corp. v. Green, 411 U.S.. 792, 802, 93 S.Ct 1817, 36 L.Ed.2d 668 (1973); *see also* James v. N.Y. Racing Ass'n, 233 F.3d 149, 153-54 (2d Cir. 2000).

Under the McDonnell Douglas framework, if the plaintiff establishes a prima facie case of discrimination, the burden of production then shifts to the defendant to offer legitimate, nondiscriminatory rational for its actions. McDonnell Douglas at 802-03. "The Plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least on of the 'motivating' factors." Back v. Hastings on Huson Union Free Sch. Dist., 365 F.3d 107, 123 (2d Cir. 2004).

In light of the standard on a motion to dismiss, Plaintiff has adequately pleaded a cause of

13

action for race discrimination under the standards set forth above. Defendant conceded that Plaintiff has satisfied the first three elements of a race discrimination claim under Title VII, and has set forth three arguments in support of its motion to dismiss: (1) Failure to raise an inference of discrimination; (2) Failure to identify similarly situated comparators; and (3) Legitimate, non-discriminatory reason for Plaintiff's "U" rating and termination. However, these arguments are insufficient to warrant dismissal of Plaintiff's claims, when viewed under the motion to dismiss standard as set forth in Iqbal.

### (a)    Inference of Discrimination

Plaintiff has met her burden of setting forth facts which give rise to an inference of discrimination based on her Chinese origin. Defendant's attempt to summarize Plaintiff's detailed allegations as "alleging she is Chines and that she worked with a non-Chinese employee" is a gross mischaracterization of the complaint and is insufficient to warrant dismissal of the action.

First, Plaintiff was subjected to direct discriminatory comments made by her supervisor. Dr. Fleishman (Jewish Caucasian) made frequent comments about Plaintiff's accent in a derogatory and humiliating manner. For instance every time Dr. Fleishman would have a conversation with Plaintiff, she will end up her sentences by saying to Plaintiff "…it's because you are Chinese". At meetings and in front of other colleagues Dr. Fleishman would constantly interrupt Plaintiff to point out the fact that Plaintiff has an accent and would tell her "Say it louder!" and "…it's because you are Chinese" . These comments were uttered to Plaintiff on a frequent basis. (Amd. Cmp. ¶ 10)

More specifically, every time Plaintiff would see Dr. Fleishman, she would  always made Plaintiff ashamed of the way she spoke English due to her remarks "it's because you are Chinese".

14

For instance, after Dr. Fleishmen became the school psychologist supervisor for P77M, she asked Plaintiff to attend her biweekly meeting for first-year clinicians; Plaintiff was in her third year as a school psychologist.  During those meetings, Dr. Fleishmen interrupted Plaintiff constantly every time she spoke and did this on purpose in order to embarrass Plaintiff and cast her as someone who spoke with a heavy accent and who could not be understood without constant repetition.  Plaintiff attended these meetings for over a year and was humiliated.  There were other school psychologists present. (Amd. Cmp. ¶ 11) Under the standards of a motion to dismiss, this could not be considered a stray remark but on the contrary was severe, pervasive and continuous. This also clearly reflects a discriminatory animus toward Plaintiff.

Moreover, on or about March 22, 2012, Plaintiff received the second unsatisfactory report from Dr. Fleishman.  Plaintiff was then asked to go to Dr. Fleishman's office on the 7th Avenue DOE building and go through her feedback with her.  During that meeting, where only Dr. Fleishman and Plaintiff were present, Dr. Fleishman was rude and very impatient. She frequently asked Plaintiff to repeat what she said. On Plaintiff's psychological report, Dr. Fleishman specifically pointed out one sentence and indicated that it was written in poorly. Plaintiff said to her that she misread Plaintiff's sentence and thus Dr. Fleishman reread it again and y it must be the English that Plaintiff used that caused her to misunderstand.  (Amd. Cmp. ¶ 12)

In addition, Plaintiff was subjected to intentional, continuous conduct (a continuing violation) that subjected Plaintiff to disparate treatment and a hostile work environment due to her Chinese national origin that caused her termination to wit:

        a.        Plaintiff was subjected to micro management and microscopic scrutiny on a

daily basis;

b.      Plaintiff was assigned the most difficult students.

c.      Plaintiff's case load was greater than other non-Chinese school psychologist.

d.      Plaintiff was harassed in an effort to force her to resign;

e.      Plaintiff was subjected to demeaning and discriminatory comments;

f.      Plaintiff received biased memos, letters to the file and discipline;

g.      Plaintiff was subjected to biased investigations;

h.      False accusations were asserted against Plaintiff;

i.      Plaintiff did not receive the same level of support as other non-Chinese school psychologist;

j.      Plaintiff was treated differently regarding professional development

k.      Plaintiff received biased observations

l.      Plaintiff received a biased annual performance review;

m.      Plaintiff's probationary status was discontinued;

n.      Other acts of discrimination.  (Amd. Cmp. ¶ 13)

Dr. Koetke would also require Plaintiff work outside her job responsibilities.  For instance, Plaintiff was asked by Dr. Koetke to be an interpreter because she had some Chinese guests visiting the school one day.  Plaintiff told Dr. Koetke that she could not do this because she needed to prepare for her IEP meetings.  (Amd. Cmp. ¶ 16)

**(b)    Plaintiff Identified Similarly Situated Comparators**

Despite Defendant's assertion to the contrary, Plaintiff has clearly identified similarly situated comparators.

For instance, in the beginning of the second school year (2011-2012) Plaintiff worked for P198M and P77M.  Dr. Koetke (Caucasian) turned the room next to Plaintiff's office into a music class for the Gifted and Talented students of P77M despite knowing that Plaintiff did all her evaluations and IEP meetings at her office. On or about September 2010, Plaintiff complained to Dr. Koetke regarding this arrangement but nothing was done.  (Amd. Cmp. ¶ 14)

Further, there were two psychologists serving P198M and P77M who were Dr. Rosen (Jewish Caucasian) and Dr. Yang (Chinese). It is the other full time psychologist's responsibility to divide all the cases for both schools between the psychologists. However, the cases were not immediately assigned to. Belatedly, Dr. Koetke purposely assigned the hardest cases to Plaintiff and she had Dr. Fleishman observed Plaintiff (see reports dated 12/9/2011, 1/24/2013) only on the most difficult cases.  Dr. Fleishman would even observe Plaintiff even if she was not the supervisor at the particular school.  (Amd. Cmp. ¶ 15)   Even though she was part-time, she was assigned a greater case load.

Plaintiff was also subjected to biased discipline.  For instance, on or about November 04, 2011 (a day before Plaintiff's formal observation) Plaintiff was disciplined in a bias manner by Dr. Fleishman (School Psychology Supervisor for P77M) and Dr. Koetke (Principal of P77M) and was written up and held as the sole person who was responsible for providing a parent with a copy of the Procedural Safeguards.  In reality, the social worker should share the responsibility, not school

psychologist alone. However, the social worker Iris Lugo-Becker (Hispanic, Puerto Rican) as well as Assistant Principal Nancy Emerick (Hispanic, Puerto Rican) were not disciplined. More specifically, on that day, Dr. Koetke sent her parent coordinator down to Plaintiff's office and asked for a copy of Procedural Safeguards. At that time Dr. Koetke's family associate, Susan Roth, stated that she did not have a copy at hand. Plaintiff suggested to her to see whether the social worker had it. Thereafter, Plaintiff was disciplined for not providing the sheet and this incident was grossly distorted in a letter accusing Plaintiff of being ignorant of basic federal, state and city guidelines regarding the protection of parent's rights, having a lack of team play, and cooperation. (Amd. Cmp. ¶ 17)

Shortly after this incident, on or about December 09, 2011 Dr. Fleishman indicated that she would like to observe Plaintiff at the Educational Planning Conference (EPC). Dr. Fleishman also indicated to Plaintiff that she would also observe Plaintiff's colleague Dr. Ronna Rosen; however this was not done and Plaintiff was the only one observed. Dr. Fleishman and Dr. Rosen share the same ethnicity. At the conference, Dr. Fleishman humiliated Plaintiff in front of all her colleagues. This observation resulted in a "U" rating (dated 12/9/2011) because Dr. Yang was falsely casted as incompetent. (Amd. Cmp. ¶ 18)

In addition, Plaintiff even though Plaintiff worked part-time, she was given the highest amount of cases (more or about the same as the other non-Chinese school psychologist (Dr. Rosen) who worked full time) and the most difficult ones. For instance, around the same time, a first grader student (E.L.) from P198M, came to the school and he was not taking his medication. E.L. had ADHD, and was also developmentally delayed. Plaintiff therefore recommended a special class for

him. According to the placement officer due to this recommendation E.L. was transferred from P198M to P77M. Plaintiff did not know a SESIS glitch wiped out her recommendation on the IEP until she received a letter falsely accusing her of having a lack of diligence and thus causing E.L.'s placement in jeopardy. (Amd. Cmp. ¶ 19) Plaintiff has set forth these numerous similarly situated comparators, to whom she was subjected to disparate treatment from. Further, the factual arguments set forth by Defendant in stating that these individuals are not similarly situated, are factual disputes that cannot be decided on a motion to dismiss.

      **(c)**    **The Legitimate Business Reason Proffered by Defendant is Merely a Pretext for Discrimination**

Under the McDonnell Douglas framework, if the plaintiff establishes a prima facie case of discrimination, the burden of production then shifts to the defendant to offer legitimate, nondiscriminatory rational for its actions. McDonnell Douglas at 802-03. "The Plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least on of the 'motivating' factors." Back v. Hastings on Huson Union Free Sch. Dist., 365 F.3d 107, 123 (2d Cir. 2004). In addition to the biased and discriminatory discipline and treatment as set forth above, Plaintiff has exhibited that each basis for Defendant's "legitimate, business reason," for her termination was false, particularly when viewed under the appropriate standard on a motion to dismiss. Defendant's reliance on information and documents outside of the four corners of the pleading are not permissible and insufficient to support dismissal of the complaint.

In particular, another student (J.J.) was to be under three year mandated evaluations from P77. One day shortly after Plaintiff completed J.J.'s case and his IEP was finalized, the special

education teacher came to Plaintiff's office and insisted that Plaintiff change his IEP from Standard

Assessment to Alternate Assessment.  Plaintiff explained to her that J.J. was not qualified for

Alternate Assessment.  Plaintiff even showed the special education teacher the section on IEP where

Alternate Assessment can be checked and went over the three questions they asked to determine

whether a student is qualified for alternate assessment. At the end, the special education teacher said

to Plaintiff to just do it because this is Dr. Koetke's recommendation. Plaintiff was written up again

by Dr. Fleishman on this incident.  (Amd. Cmp. ¶ 20)

The last observation for school year 2011-2012 was conducted by Dr. Fleishman on one of

Plaintiff's P198 initial cases: H.L., a kindergartner. This time Dr. Fleishman not only observed

Plaintiff's EPC meeting, but also went through all her evaluation protocols and her psycho-

educational report.   The observation report she wrote dated 3/22/2012 was full of erroneous

information. For example, Dr. Fleishman noted that Plaintiff allegedly made a mistake in that "Dr.

Yang indicated H.L.'s academic difficulties could be attributed to her slow processing speed. Yet

her WPPSI-III processing speed was average, and her greatest cognitive strength".  Conversely, the

actual sentence on Plaintiff's report was "H.L presents as an overall slow learner, she needs more

time to process the information she receives auditorily".  The Processing Speed sub-domain of the

IQ tests, as Plaintiff wrote in her report, provided an estimate of an individual's ability to quickly

and correctly scan, sequence, and discriminate simple visual information.  (Amd. Cmp. ¶ 21)

In other words, Plaintiff indicated that H.L is a visual learner and that she exhibited auditory

processing issues. When Plaintiff pointed out the actual sentence on her report to Dr. Fleishman, it

was indicated by Fleishman that the misunderstanding was due to Plaintiff's poor English. Dr.

Fleishman further stated that 99.9% of people are visual learners, so that there was no point for Plaintiff to mention that in her psycho-educational report at all.  In addition, Fleishman wrote that Plaintiff inappropriately wrote H.L.'s IEP goals in the report.  Ironically, the IEP goals Plaintiff wrote for H.L. were based on the links Dr. Fleishman later sent to help the school psychologist developing the IEP goals.  (Amd. Cmp. ¶ 21)

Another "U" rating was given based on an evaluation done on another third grade student named A.S. from P77. Dr. Yang did the initial evaluation; however, this was a re-evaluation to add counseling and speech/language services. The student was diagnosed with ADHD. Dr. Fleishman gave Plaintiff a "U" rating because Plaintiff allegedly "failed to incorporated the basic suggestions to have meeting participants introduce themselves...unable to direct the meeting or control it...relevant documents were not finalized in a timely fashion."   This was patently false.  On the contrary, Plaintiff's efforts made the meeting efficient and smooth. Everybody who came to the meeting had a very clear picture of the purpose of meeting and how to proceed except Dr. Fleishman. As for finalizing the IEP, Plaintiff's main concern was the IEP should be completed before finalizing it. The participants should have put their pieces in before Plaintiff could finalize the IEP. To finalize an incomplete IEP will ultimately invalidate that IEP.  (Amd. Cmp. ¶ 22)

The second unsatisfactory observation by Dr. Fleishman came about a month later and was based on a fifth grader student named S.C.  Plaintiff was not informed of the observation until that day.  As a result, Plaintiff did not have a chance to brief Dr. Fleishman regarding what the case was about.  Dr. Fleishman was the only person in the meeting without any prior knowledge and needed to be introduced to others present. She gave Plaintiff a "U" observation reiterating her previous

comments regarding the lack of formal introduction of the participants and an opening statement of the referral question. Again, this was another false statement. Additionally, in her report she distorted Plaintiff's intention to stop S.C.'s negative behaviors to punish S.C. for misbehaving and thereafter Dr. Fleishman took credit upon herself as the first person in the meeting to bring up FBA and BIP. There were nine people at the meeting. They all knew S.C. needed an IEP with FBA and BIP, and that was exactly why they were there for: to brainstorm what could and should be put in the BIP so that S.C.'s behaviors could be monitored effectively both in school and at home. Dr. Fleishman "U" rating was biased and discriminatory. (Amd. Cmp. ¶ 23)

The last "U" observation of the school year 2012-2013 came from Dr. Koeke herself. She assigned a case to Plaintiff, knowing that it was a very difficult case. The case was of J.S., a third grader attending the Gifted and Talented Class in P77. J.S. had been receiving outside tutoring for over two years. The parents brought with them a very extensive neuropsychological evaluation conducted by an outside evaluator requesting the special education services. In the pre-conference with Dr. Koeke, Plaintiff explained to her that J.S. was not eligible to receive special education services based on the report provided by the parents. Dr. Koeke agreed. The challenge was how to deliver the message without upsetting the parents. After an hour long meeting, the parents felt relieved even without recommending any service, because they knew the school can help J.S. by avenues other than mandated special education services and the school promised to keep a close eye on J.S.'s academic performance, providing intervention if the situation necessitated it. Dr. Koeke gave Plaintiff a "U" rating by reiterating Dr. Fleishman's comment regarding Dr. Yang lack of formal introduction and by putting "at risk" services for J.S. which was false. (Amd. Cmp. ¶ 24).

22

The final overall "U" rating on Plaintiff's year-end Professional Performance Review for the school year 2012-2013, there were a total of 22 items divided into 3 categories. Out of 22 items Plaintiff only obtain 3 "S" in Attendance and punctuality, Personal appearance under Category "Personal and Professional Qualities", and Relationship with other pupil personal workers under Category "Interpersonal Relationship". However, on her previous year-end rating, she had an overall rating of "S" with 17 out of 22 items rated "Satisfactory". If one places these two end of year evaluations side to side, it would be easy to notice that within a year all 12 items under Category "SBST Activities" (School-Based Support Team), which were marked "S" the previous year, were now marked a "U" on this 2012-2013 year. Above all, there was no evidence supporting Dr. Fleishman's and Dr. Koeke's "U" observations. The "U" observations were given to Dr. Yang in an effort to paper her file and ultimately terminate her. (Amd. Cmp. ¶ 25).

On or about January 15, 2013, Plaintiff refused to sign the observation report written by Dr. Fleishman. Plaintiff told her that she could not sign because it was not a fair observation and was discriminatory. The date of observation was December 14, 2012. (26). On or about March 08, 2013, Plaintiff refused to sign another observation report by Dr. Fleishman for the same reason. The date of this observation was January 24, 2013. (Amd. Cmp. ¶ 27). Thus, it is clear from the above that Plaintiff has satisfied her burden of setting forth a claim under Title VII in that the reasons for Plaintiff's termination are pretextual.

**(2)    Hostile Work Environment Claim Under Title VII**

In evaluating a hostile work environment claim, the fact finder must consider "all the circumstances." Oncale v. Sundowner Offshore Services, Inc., 118 S. Ct. 998 (1998); Henson v City

of Dundee, 682 F.2d 897, 904 (11th Cir. 1982) ("[T]he district court should not carve the work

environment into a series of discrete incidents and then measure the harm adhering in each episode.

Instead, the trier of fact must keep in mind that each successive episode has its predecessors, that the

impact of the separate incidents may accumulate and that the work environment created thereby may

exceed the sum of the individual episodes"); Smith v. Kmart, supra, 1996 WL 780490 at *8 (using

"totality of circumstances" standard in age harassment case)There is no "threshold magic number"

that courts will apply to determine whether theconduct meets the "severe or pervasive" standard.

Rodgers v. Western-Southern Life Ins. Co., 12 F.3d 668, 674 (7th Cir. 1993): Vance v. Southern Bell

Tel. & Tel. Co., 863 F.2d 1503, 1511 (11th Cir. 1989).  The courts have applied several general

principles.    First, courts consider the number of incidents as a factor, but this is not alone

determinative.  Woods v. Graphic Communications, Union Local 747, 925 F.2d 1195, 1201 (9th Cir.

1991); Daniels v. Essex Group, Inc., 937 F.2d 1264, 1273-74 (7th Cir. 1991); Smith v. Northwest

Financial Acceptance, Inc., 129 F.3d 1408, 1415 (10th Cir. 1997) (finding six statements during

approximately two years of employment sufficient for a hostile work environment; "[T]he word

'pervasive' is not a counting measure. The trier of fact utilizes a broader contextual analysis. It

begins with the number, sequence, and timing of the conduct. The fact finder then looks at the

nuances of an environment that is imposed by each instance of discriminatory behavior"); (three

incidents of ethnic slur in one year constitutes colorable claim of harassment).

Second, the required showing of severity or seriousness of the harassing conduct varies

inversely with the pervasiveness or frequency of the conduct.  In other words, the more egregious

the conduct, the fewer incidents needed to meet the legal standard. Ellison v. Brady, 924 F.2d 872,

878 (9th Cir. 1991); <u>Steiner v. Showboat Operating Company</u>, 25 F.3d 1459, 1463 n.4. (9th Cir.

1994). Thus, the more serious the incidents the less frequently they need occur to establish a hostile

work environment. Several courts have recognized that under the "severe-or-pervasive" test, a single

incident of invidious harassment can create a hostile work environment. <u>See</u>, <u>e.g.</u>, <u>Daniels v. Essex</u>

<u>Group, Inc.</u>, 937 F.2d 1264, 1274 n.4 (7th Cir. 1991) (indicating a single instance of racial

harassment can establish a hostile work environment); Third, Courts do not use a hard and fast rule

regarding the specific time period within which harassing conduct occurs in order to be sufficiently

severe or pervasive. <u>See</u>, <u>e.g.</u>, <u>Waltman v. International Paper Co.</u>, 875 F.2d 468, 476 (5th Cir. 1989)

(hostile work environment claims not defeated by time gaps between the specific incidents of

harassment, noting cases in which harassment involved separate incidents spanning many years).

For the sake of brevity, Plaintiff will not reiterate in their entirety, the allegations as set forth

above which give rise to a Title VII hostile work environment claim. In sum, Plaintiff was subjected

to continuous disparaging comments due to her race, and was subjected to both biased discipline and

observations over the course of both the 2010-2011 and 2011-2012 school year.

## <u>CONCLUSION</u>

For all the above reasons, Plaintiff respectfully request that Defendants' motion to

dismiss the petition be denied in its entirety and for any other relief that is just and equitable.

Dated: New York, New York
    July 28, 2015

Respectfully submitted

 s/ Stewart Lee Karlin
STEWART LEE KARLIN
Attorney for Plaintiff
9 Murray Street, Suite 4W
New York, NY 10007
(212) 792-9670

25