UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x

DR. HAIAI YANG,

                Plaintiff,

     -against-

THE DEPARTMENT OF EDUCATION OF
THE CITY OF NEW YORK, AND THE
BOARD OF EDUCATION OF THE CITY
SCHOOL DISTRICT OF NEW YORK,

                Defendant.

---------------------------------------------------------x

**MEMORANDUM AND ORDER**

14-CV-7037 (SLT) (RLM)

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JUL 26 2016 ★

BROOKLYN OFFICE

**TOWNES, United States District Judge:**

     Plaintiff Huiai Yang is a Chinese-born psychologist who was formerly employed by

defendant Board of Education of the City School District of the City of New York ("BOE" or

"Defendant"), also known as the Department of Education of the City of New York. In

November 2014, Plaintiff commenced an action against the BOE in the Supreme Court of the

State of New York, Kings County, alleging that she was subjected to disparate treatment and a

hostile work environment on account of her national origin in violation of Title VII of the Civil

Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e. Defendant timely removed the case to this

Court and now moves to dismiss the action pursuant to Rule 12(b)(6) of the Federal Rules of

Civil Procedure, arguing that some claims are time-barred and that Plaintiff's Amended

Complaint fails to state a plausible national origin discrimination or hostile work environment

claim. For the reasons set forth below, that motion is denied in all respects.

## BACKGROUND

     The following facts are drawn from the Amended Complaint filed on March 6, 2015, and

are assumed to be true for purposes of this memorandum and order. Plaintiff is a Chinese-born

psychologist who was hired by the BOE in 2009 (¶ 6).[1] She was assigned to three schools. On Mondays and Tuesdays, she worked at P721M, a "specialized school for high school students" (¶ 8). The rest of the week, she worked at P198M/P77M—two separate schools which share the same building (¶ 8).

P198M was Plaintiff's "payroll school" and its principal, Roebuck, was Plaintiff's "rating officer" for the years 2009, 2010, and 2011 (¶ 8). Dr. Fleishman—a Caucasian, Jewish woman—was Plaintiff's "psychologist supervisor" at P721M from 2009 to 2011 (Second ¶ 6), and became the psychologist supervisor at P77M in 2011 (Second ¶ 7).[2] Fleishman "made frequent comments about Plaintiff's accent in a derogatory and humiliating manner" (¶ 10). Indeed, Plaintiff alleges that during every conversation with Plaintiff, Fleishman would "end up her sentences by saying to Plaintiff '…it's because you are Chinese'" (¶ 10). In addition, "[a]t meetings and in front of other colleagues[,] ... Fleishman would constantly interrupt Plaintiff to point out the fact that Plaintiff has an accent and would tell her 'Say it louder!' and '… it's because you are Chinese'" (¶ 10). Nonetheless, Plaintiff received at least three satisfactory evaluations (¶ 9).

Although Fleishman had been Plaintiff's supervisor at P721M, Plaintiff alleges that she "initially started to observe [Plaintiff] after ... Fleishman became the school psychology supervisor for P77M in 2011." (Second ¶ 7). Fleishman soon asked Plaintiff to attend her bi-weekly meeting for first-year clinicians, even though Plaintiff was in her third year as a school psychologist (¶ 11). During those meetings, Fleishman interrupted Plaintiff every time she spoke

---

[1] Numbers in parentheses preceded by "¶" denote paragraphs in the Amended Complaint.

[2] The Amended Complaint contains two paragraphs numbered 6, 7 and 8.

and "cast her as someone who spoke with a heavy accent and who could not be understood without constant repetition" (¶ 11). Plaintiff was humiliated, but attended these meetings for "over a year" (¶ 11).

On November 4, 2011, Plaintiff was disciplined by Fleishman and Dr. Koetke, the Caucasian principal of P77M, for an incident in which she failed to provide a copy of the "Procedural Safeguards" to a "parent coordinator" who had been sent by Koetke to obtain a copy of this document. Plaintiff did not have a copy and suggested that the parent coordinator "see whether the social worker had it" (¶ 17). Plaintiff was subsequently "written up" for not providing the document, and was accused "of being ignorant of basic federal, state and city guidelines regarding the protection of parent's rights, having a lack of team play, and cooperation" (¶ 17). Although the social worker also did not have a copy of the Procedural Safeguards, she was not disciplined (¶ 17). The Amended Complaint notes that both the social worker and the Assistant Principal, Nancy Emerick, were Puerto Rican Hispanics (¶ 17).

On December 9, 2011, Fleishman announced that she would like to observe both Plaintiff and another school psychologist—a Caucasian, Jewish woman named Dr. Ronna Rosen—at an "Educational Planning Conference" (¶ 18). Yet, Fleishman eventually observed only Plaintiff, not Rosen (¶ 18). During that conference, Fleishman "cast[ ] [Plaintiff] as incompetent" and "humiliated Plaintiff in front of all her colleagues" (¶ 18). Thereafter, Fleishman penned the first of five unsatisfactory observational reports which Plaintiff was to receive prior to her termination in June 2013 (¶ 18).

Plaintiff received a second unsatisfactory observational report from Fleishman on March 22, 2012, in connection with Fleishman's review of one of Plaintiff's initial P198M cases: a

kindergartner named H.L. (¶ 21). According to Plaintiff, that report was "full of erroneous information" (¶ 21). Fleishman claimed that Plaintiff had incorrectly stated that H.L had "slow processing speed," when Plaintiff had actually written that "H.L presents as an overall slow learner, she needs more time to process the information she receives auditorily" (¶ 21). At a subsequent meeting to discuss the report, Fleishman was rude, very impatient, and frequently asked Plaintiff to repeat what she said (¶ 12). She also criticized Plaintiff's writing, first claiming that a particular sentence was "written ... poorly" and, after Plaintiff explained what she meant, saying "it must be the English that Plaintiff used that caused [Fleishman] to misunderstand" (¶ 12).

Plaintiff received yet another "U" rating from Fleishman in connection with an evaluation which Plaintiff performed on a third-grade student, A.S., from P77M. Fleishman claimed that Plaintiff failed to have meeting participants introduce themselves, was unable to direct or control the meeting, and did not finalize the Individualized Education Plan ("IEP") in a timely fashion (¶ 22). Plaintiff characterizes Fleishman's criticisms as "patently false" (¶ 22). She tacitly admits that the IEP was delayed, but asserts that others caused the delay by failing to "put their pieces in," and notes that "finaliz[ing] an incomplete IEP will ultimately invalidate that IEP" (¶ 22).

A month later, Plaintiff received an "unsatisfactory" in connection with Fleishman's observation of Plaintiff's handling of a fifth-grader's case (¶ 23). Fleishman again criticized Plaintiff for failing to have the participants introduce themselves, faulted Plaintiff for not making "an opening statement of the referral question," distorted Plaintiff's statements, and

incorrectly took credit for being the first at the meeting to mention "FBA" and "BIP" (¶ 23).[3] Plaintiff asserts that the other participants already knew each other and already knew the child needed a FBA and BIP, and that the "'U' rating was biased and discriminatory" (¶ 23).

The last "'U' observation" which Plaintiff was to receive came from Principal Koetke, who observed Plaintiff explaining to the parents of a third grader, J.S., why their child was not entitled to certain special education services which had been recommended by an outside evaluator retained by the parents. While agreeing with the decision to deny J.S. the services, Koetke criticized Plaintiff for a "lack of formal introduction" and for "putting 'at risk' services for J.S." (¶ 24). Plaintiff asserts that Koetke's criticisms were "false," and implies that Koetke set her up for failure by purposely assigning Plaintiff "a very difficult case" (¶ 24).

Plaintiff, who was on probationary status throughout her tenure with the BOE, was terminated in June 2013 after receiving a "U" rating on her year-end review (¶¶ 9, 25). Although Plaintiff had received a satisfactory rating in 17 of 22 categories on her previous year-end review, she received only three "S" ratings in the June 2013 review: in attendance, appearance, and relationship with co-workers (¶ 25). Indeed, Plaintiff received a "U" rating in all 12 items listed under the category, "SBST Activities," despite having received a satisfactory rating in all 12 categories the preceding year (¶ 25).

---

[3]An "FBA" is a Functional Behavioral Assessment, a process for assessing the causes of a student's behavioral problems. *See* http://cecp.air.org/fba. A "BIP," or Behavior Intervention Plan, takes the observations made during the FBA and turns them into a concrete plan of action for managing the behavior. *See* http://specialed.about.com/od/idea/g/BIP.htm.

*The Instant Action*

Plaintiff commenced this action in the Supreme Court of the State of New York, Kings County, in late 2014, alleging violations of Title VII. After Defendant removed the action to this Court in early December 2014, Plaintiff filed the Amended Complaint, the factual allegations of which are described at length above. That pleading contains two causes of action, both of which consist of a single sentence. The first alleges that Defendant violated Title VII by "subjecting Plaintiff to discrimination due to her national origin" (¶ 42). The second alleges that Defendant violated Title VII by "subjecting [P]laintiff to a hostile work environment" (¶ 43).

The first cause of action does not itself allege disparate treatment, but the Amended Complaint mentions disparate treatment in other sections (¶¶ 35, 40). The Amended Complaint states that "there were clearly differential treatments" for Plaintiff and Dr. Rosen, the other psychologist assigned to P198M and P77M. First, although Plaintiff worked only part-time, while Rosen was full-time, Plaintiff was assigned more or the same number of cases as Rosen and "the most difficult ones" (¶ 19). Rosen also received "clear preferential treatment" in that she had a bigger office which, unlike Plaintiff's, was air-conditioned and did not have to be shared with others (¶ 31). In addition, Rosen did not have to hold doors for students during fire drills, as did Plaintiff (¶ 31).

Although Ms. Emerick, who replaced Roebuck as principal of P178M, terminated Plaintiff (¶ 28), the Amended Complaint blames Fleishman and Koetke, both of whom are Caucasian, for causing Plaintiff's termination. The pleading notes that Emerick was formerly Koetke's assistant principal (¶ 28), and implies that the final year-end review was based on Fleishman's and Koetke's observations of Plaintiff. The Amended Complaint alleges that

Koetke "purposely assigned the hardest cases to Plaintiff" and had Fleishman observe Plaintiff "only on the most difficult cases" (¶ 15), and that the unsatisfactory ratings Plaintiff received in connection with these observations was "an effort to paper her file and ultimately terminate her" (¶ 25).

Aside from the termination, the Amended Complaint attributes a few other allegedly adverse actions to Koetke and Fleishman. First, the pleading alleges that at the beginning of the 2011-2012 school year, Koetke "turned the room next to Plaintiff's office into a music class ..., despite knowing that Plaintiff did all her evaluations and IEP meetings at her office," then took no action in response to Plaintiff's complaints regarding this arrangement (¶ 14). Second, the Amended Complaint alleges that Koetke required Plaintiff to "work outside her job responsibilities" by asking her to translate for some Chinese visitors—something Plaintiff apparently refused to do (¶ 16). In addition, the pleading alleges that Plaintiff was "written up" by Fleishman for rejecting Koetke's recommendation that a student's IEP be changed "from Standard Assessment to Alternate Assessment" (¶ 20). However, the complaint does not allege that Koetke made any comments regarding Plaintiff's ethnicity.

### Defendant's Motion to Dismiss

The BOE now moves to dismiss the Amended Complaint, in whole or in part, on three grounds. First, Defendant argues that any discrete acts of discrimination that occurred more than 300 days prior to the filing of the Charge of Discrimination with the EEOC are time-barred. Although the Amended Complaint does not allege precisely when Plaintiff filed her EEOC Charge, Defendant has provided the Court with a copy of a Charge of Discrimination and a cover letter accompanying the charge. *See* Declaration of Asst. Corporation Counsel Tanya N.

Blocker, dated June 26, 2015 (the "Blocker Declaration"), Ex. A. The Charge itself is undated but the cover letter bears a date stamp indicating that it was received by the EEOC on December 23, 2013. *Id.* Noting that the Amended Complaint specifically alleges that four of the negative evaluations preceded January 24, 2013, Defendant argues that "claims that [Plaintiff] was subjected to biased observations, memos, letters to file and/or discipline" prior to February 26, 2013, are time-barred. Memorandum of Law in Support of Defendant's Motion to Dismiss the Amended Complaint ("Defendant's Memo"), p. 8. Defendant also argues that any claims relating to degrading comments made prior to February 26, 2013, are time-barred, but notes that the Amended Complaint does not allege the exact date on which such comments were made. *Id.*, p. 9.

In the second point, Defendant's Memo asserts that Plaintiff has failed to state a plausible claim of national origin discrimination under Title VII. First, characterizing Fleishman's repeated comments regarding Plaintiff's nationality and accent as "isolated derogatory remarks," Defendant argues that Plaintiff has not alleged facts sufficient to suggest that she suffered an adverse employment action under circumstances giving rise to an inference of discrimination. Second, Defendant argues that the Amended Complaint's allegations regarding Rosen are insufficient to establish that she is a similarly situated comparator, asserting that the pleading offers only "conclusory allegations and characterizations of selective treatment." Defendant's Memo, p. 17. Third, Defendant argues that the BOE had legitimate, non-discriminatory reasons for giving Plaintiff unsatisfactory ratings and for terminating her.

In the third and final point, Defendant argues that the Amended Complaint fails to state a hostile work environment claim. Characterizing Plaintiff's description of Fleishman's comments

as "conclusory, unspecific allegations," Defendant argues that "the Amended Complaint lacks plausible facts sufficient to meet the severe or pervasive threshold for a plausible claim of hostile work environment." Defendant's Memo, pp. 20-21. Defendant also asserts that the pleading has "alleged no facts to suggest that the Defendant's alleged actions were motivated by discriminatory animus directed at Plaintiff because of her race or national origin." *Id.*, p. 21.

## DISCUSSION

### Point I: The Timeliness of Plaintiff's Claims

"Before an individual may bring a Title VII suit in federal court, the claims forming the basis of such a suit must first be presented in a complaint to the EEOC or the equivalent state agency." *Williams v. N.Y.C. Housing Auth.*, 458 F.3d 67, 69 (2d Cir. 2006) (citing 42 U.S.C. § 2000e-5). The time period for filing a charge of discrimination varies, depending on whether the individual files his charge directly with the EEOC or with a state or local agency. In New York, which has both state and local fair employment agencies, an individual who initially files a grievance with the state or local agency must file a charge with the EEOC within 300 days after the alleged unlawful employment practice occurred, or within 30 days after receiving notice that the state or local agency has terminated the proceeding, whichever is earlier. 42 U.S.C. § 2000e-5(e)(l). If a charge is filed solely with the EEOC, it must be filed within 180 days after the alleged unlawful employment practice occurred. *Id.*

A discrete retaliatory or discriminatory act occurs on the day that it happens. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002). A plaintiff must, therefore, file a Charge of Discrimination within either 180 or 300 days of the date of those discrete retaliatory

or discriminatory acts or lose the ability to recover for them. *Id*. "[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Id*. at 113.

In contrast, hostile work environment claims involve repeated conduct which occurs over a series of days or perhaps years. *Id*. at 115. This sort of "unlawful employment practice ... cannot be said to occur on any particular day." *Id*. Accordingly, "[i]n order for the charge to be timely, the employee need only file a charge within 180 or 300 days of any act that is part of the hostile work environment." *Id*. at 118.

The parties to this action agree that Plaintiff filed a Charge of Discrimination with the EEOC on December 23, 2013. Defendant's Memo, p. 8 (citing Blocker Declaration, Ex. A); Plaintiff's Opposition, p. 10. Although there is no evidence that Plaintiff initially filed a grievance with a state or local agency, the parties also agree that the 300-day limitations period applies to this case and that all claims accruing on or after February 26, 2013, are timely. *Id*. However, there appears to be some confusion regarding the nature of Plaintiff's claims.

Defendant's Memo correctly notes that the Amended Complaint alleges that "Plaintiff received 5 unsatisfactory observational reports" between December 9, 2011, and January 24, 2013. Defendant's Memo, p. 8 (citing Amended Complaint, Second ¶ 6). Citing to cases for the proposition that unwarranted negative evaluations and false disciplinary charges can be considered "discrete acts," Defendant then argues that "to the extent that Plaintiff claims that she was subjected to biased observations, memos, letters to file and/or discipline that occurred prior to February 26, 2013, such a Title VII claim must be dismissed as time barred." Defendant's Memo, p. 8. In responding to this argument, Plaintiff notes that "discriminatory

acts which are not themselves the basis of timely charges of discrimination ... 'may constitute relevant background evidence ...,'" Plaintiff's Opposition, pp. 10-11 (quoting *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558 (1977)). Plaintiff also implies that the allegations relating to the pre-February 26, 2013, observational reports were made in furtherance of a hostile work environment or "continuing violation" claim.

The Court agrees with Defendant that the negative evaluations issued prior to February 26, 2013, cannot each serve as the basis for a separate Title VII claim. Unsatisfactory ratings and negative evaluations are discrete acts. *See Dimitracopoulos v. City of New York*, 26 F. Supp. 3d 200, 212 (E.D.N.Y. 2014) ("allegedly discriminatory 'unsatisfactory' rating for the 2011-2012 school year is a discrete act ..."); *Siddiqi v. N.Y.C. Health & Hosps. Corp.*, 572 F. Supp. 2d 353, 366 (S.D.N.Y. 2008) ("Each negative performance evaluation is a discrete act."). Since those discrete acts occurred more than 300 days before Plaintiff's Charge of Discrimination was filed with the EEOC, individual claims arising from these discrete acts are time-barred.

To the extent that Plaintiff is asserting that the "continuing violation" doctrine works to render timely the claims arising from these discrete acts, the Court disagrees. The continuing violation doctrine provides that "if a plaintiff has experienced a continuous practice and policy of discrimination, ... the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it." *Fitzgerald v. Henderson*, 251 F.3d 345, 359 (2d Cir. 2001) (internal quotation marks and citations omitted). "Conduct that has been characterized as a continuing violation is 'composed of a series of separate acts that collectively constitute one unlawful employment practice.'" *Washington v. County of Rockland*, 373 F.3d 310, 318 (2d Cir. 2004) (quoting *Morgan*, 536 U.S. at 111 (internal quotation marks in *Morgan* omitted)).

11

"[M]ultiple incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation." *Lambert v. Genesee Hosp.*, 10 F.3d 46, 53 (2d Cir. 1993), *overruled on other grounds*, *Greathouse v. JHS Sec. Inc.*, 784 F.3d 105 (2d Cir. 2015).

Plaintiff is correct in arguing, however, that the pre-February 26, 2013, evaluations can be considered as background evidence and for purposes of Plaintiff's hostile work environment claim. As the Supreme Court noted in *Morgan*, 536 U.S. at 115, hostile work environment claims involve repeated conduct which occurs over a series of days or perhaps years. *Id.* at 115. Accordingly, a hostile work environment claim can encompass actions which occur more than 300 days prior to the filing of the Charge of Discrimination and is timely if at least one of the acts creating the hostile work environment occurred during the 300 day period. Since the Amended Complaint alleges that the "biased annual performance review," which Plaintiff received in June 2013, was among the acts creating a hostile work environment, Plaintiff's hostile work environment claim is timely even though it encompasses incidents which occurred prior to February 26, 2013, such as the unsatisfactory observational reports which Plaintiff received between December 9, 2011, and January 24, 2013, and various comments that were allegedly intended to degrade or humiliate Plaintiff.

### Point II: Sufficiency of Plaintiff's Allegations of National Origin Discrimination

#### A. Inference of Discrimination

The Amended Complaint's first cause of action alleges that Defendant discriminated against Plaintiff based on her national origin in violation of Title VII. To prove a prima facie

case of national original discrimination under Title VII, "a plaintiff must prove that (1) he is a member of a protected class, (2) he was qualified for his position of employment, (3) he suffered an adverse employment action, and (4) the circumstances give rise to an inference of discrimination. *Khan v. Bank of Am., N.A.*, 572 F. Supp. 2d 278, 291 (N.D.N.Y. 2008) (citing *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 63 (2d Cir. 1997)). In the first of three arguments raised in Point II of Defendant's Memo, Defendant argues that the first cause of action should be dismissed because Plaintiff has failed to plead sufficient facts to establish the fourth of these elements.

Preliminarily, the Court notes that this argument implies that the allegations in the Amended Complaint must make out a prima facie case of disparate treatment discrimination in order to survive a motion to dismiss. The Supreme Court held to the contrary in *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002), stating that an employment discrimination complaint need only satisfy the requirements of Rule 8 of the Federal Rules of Civil Procedure and need *not* set forth "specific facts establishing a prima facie case of discrimination" to survive a motion to dismiss. *Id.*, at 508. Rule 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief."

To be sure, the question of what pleading standard to employ in reviewing discrimination complaints became "somewhat less settled" after the Supreme Court abandoned the "no-set-of-facts standard" of *Conley v. Gibson*, 355 U.S. 41 (1957), in favor of the "plausibility standard" enunciated in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). *See E.E.O.C. v. Port Auth.*, 768 F.3d 247, 253 (2d Cir. 2014). For a while, there was "uncertainty ... as to whether *Twombly* and *Iqbal* overruled *Swierkiewicz* entirely, or

whether *Swierkiewicz* survive[d] only to the extent that it bar[red] the application of a pleading standard to discrimination claims that is heightened beyond *Twombly*'s and *Iqbal*'s demand for facial plausibility." *Id.* at 254. However, in 2014, the Second Circuit "reject[ed] the first proposition," and recognized *Swierkiewicz*'s continuing viability. *Id.* The Second Circuit observed that "a discrimination complaint need not allege facts establishing each element of a prima facie case of discrimination to survive a motion to dismiss ..." *Id.* (citing *Swierkiewicz*, 534 U.S. at 510). Rather, "it must at a minimum assert nonconclusory factual matter sufficient to nudge[ ] [its] claims ... across the line from conceivable to plausible ...." *Id.* (internal quotation marks omitted).

In this case, Plaintiff has alleged enough facts to state a plausible claim of national origin discrimination. "The circumstances that give rise to an inference of discriminatory motive include actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus, *see Ostrowski v. Atlantic Mut. Ins. Cos.*, 968 F.2d 171, 182 (2d Cir. 1992), [and] preferential treatment given to employees outside the protected class, *see Washington v. Garrett*, 10 F.3d 1421, 1434 (9th Cir. 1993)." *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996). In this case, the Amended Complaint clearly alleges that Plaintiff's immediate supervisor made remarks that could be viewed as reflecting animus against Plaintiff on account of her national origin.

Defendant argues that Dr. Fleishman's statements "amount to nothing more than stray remarks," and cite to cases holding that "isolated derogatory remarks ... alone do not raise an inference of discrimination." Defendant's Memo, p. 13 (citing *Gonzalez v. Allied Barton Sec. Servs.*, No. 08 Civ. 9291 (RJS)(RLE), 2010 WL 3766964, at *5 (S.D.N.Y. Sept. 7, 2010) (report

14

and recommendation adopted, 2010 WL 3766954 (S.D.N.Y. Sept. 27, 2010)).  These cases also recognize that "the more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination." *Tomassi v. Insignia Financial Group, Inc.*, 478 F.3d 111 (2d Cir. 2007), *abrogated in part on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009).  Conversely, "[t]he more a remark evinces a discriminatory state of mind, and the closer the remark's relation to the allegedly discriminatory behavior, the more probative that remark will be." *Id.*

Although it is unclear precisely when Fleishman's comments were made, the Amended Complaint makes clear that the comments were not merely "stray remarks."  The pleading alleges that Dr. Fleishman, "made *frequent* comments about Plaintiff's accent in a derogatory and humiliating manner" (¶ 10); would end her sentences, during *every* conversation with Plaintiff, by saying "it's because you are Chinese;" and would "*constantly* interrupt Plaintiff," during meetings and in front of colleagues, "to point out the fact that Plaintiff has an accent" and was Chinese.  Amended Complaint, ¶ 10 (emphasis added).  Accordingly, cases like *Gonzalez v. Allied Barton Sec. Servs.*, *supra*, which involved a single statement, or *Valtchev v. City of New York*, 400 Fed. App'x 586, 591 (2d Cir. 2010) (summary order), which involved two comments, are clearly distinguishable.

Rather, the facts in this case more closely resemble those in *Tomassi v. Insignia Fin. Grp.*, *supra*.  In that case, the plaintiff's supervisor made age-related comments to the plaintiff once a month or every couple of months.  Nonetheless, the district court granted summary judgment to the defendant.  The court attributed no significance to the supervisor's numerous comments on the plaintiff's age because it classified them as "stray remarks," and noted that

15

stray remarks "have been held not to be ... sufficient evidence to support age discrimination claims." *Tomassi v. Insignia Financial Group, Inc.*, 398 F. Supp. 2d 263, 271 (S.D.N.Y. 2005). On appeal, the Second Circuit reversed, stating:

> [W]e do not understand why the district court characterized Stadmeyer's remarks as stray. The remarks were made by the person who decided to terminate Tomassi. They could reasonably be construed, furthermore, as explaining why that decision was taken.

*Tomassi*, 478 F.3d at 116.

Although Dr. Fleishman may not have been Plaintiff's "rating officer" or the person who formally terminated Plaintiff, she was Plaintiff's immediate supervisor and the author of four of the five negative observation reports which ultimately led to Plaintiff's termination. Moreover, Plaintiff alleges that many of these reports contained false statements, erroneous information and biased criticism, implying that Fleishman was fabricating a basis for Plaintiff's termination. These facts, taken together, give rise to an inference that anti-Chinese animus may have played a part in Plaintiff's termination.

### B. Allegations concerning Similarly Situated Individuals

The second of the three arguments contained in Point II of Defendant's Memo implies that a plaintiff must provide detailed allegations regarding "similarly situated comparators" in order to make out a Title VII discrimination or disparate treatment claim. This argument is incorrect in several respects.

To establish a prima facie case of Title VII discrimination or disparate treatment, a plaintiff must show that (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse action took

16

place under circumstances giving rise to an inference of discrimination. *Ruiz v. County of Rockland*, 609 F.3d 486, 492 (2d Cir. 2010) (discrimination); *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004) (disparate treatment). One recognized method of raising an inference of discrimination for purposes of making out the fourth element is through "[a] showing of disparate treatment—that is, a showing that an employer treated plaintiff 'less favorably than a similarly situated employee outside his protected group.'" *Ruiz*, 609 F.3d at 493 (quoting *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003)). To establish an inference of discrimination in this manner, "a plaintiff must allege that 'she was similarly situated in all material respects to the individuals with whom she seeks to compare herself.'" *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 230 (2d Cir. 2014) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)) (internal quotation marks in *Graham* omitted). What constitutes "all material respects" varies from case to case, and the question of "'[w]hether two employees are similarly situated ... presents a question of fact,' rather than a legal question to be resolved on a motion to dismiss." *Id.* (quoting *Graham*, 230 F.3d at 39).

Showing disparate treatment, however, is only one method of raising an inference of discrimination. As noted on page 14, *ante*, remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus can also give rise to an inference of discriminatory motive. *Chertkova*, 92 F.3d at 91 (citing *Ostrowski*, 968 F.2d at 182). Although the Amended Complaint mentions "disparate treatment" and alleges that Rosen, a Jewish Caucasian, was treated better than Plaintiff, the pleading also alleges that Fleishman made remarks suggesting that she harbored some animus against persons of Chinese origin.

In light of this more direct evidence of discrimination, the Court cannot dismiss Plaintiff's first cause of action for failure to include in the pleading a detailed comparison of Plaintiff and Rosen. *Swierkiewicz v. Sorema N. A., supra*, not only held that an employment discrimination plaintiff need not plead a prima facie case of discrimination, but also found that it would be "incongruous to require a plaintiff, in order to survive a motion to dismiss, to plead more facts than he may ultimately need to prove to succeed on the merits if direct evidence of discrimination is discovered." *Id.*, 534 U.S. at 511-12. Accordingly, to require Plaintiff to allege detailed facts regarding Rosen—such as "i) employee status, i.e., probationary or permanent, ii) duties and responsibilities, iii) case assignments and how they ... compared to Plaintiff's, and iv) observational and annual evaluation[s]," *see* Defendant's Memo, p. 16— would run contrary to the teachings of *Swierkiewicz.*

Moreover, the law does not require detailed pleadings regarding the similarly situated comparators. To the contrary, the Second Circuit implied in *Brown v. Daikin America, Inc.*, *supra*, that allegations that the plaintiff and comparators worked in the same group, were accountable to the same supervisors, but were subjected to disparate treatment may be sufficient to raise an inference of discrimination. In *Brown*, the defendants argued that the American plaintiff failed to allege plausibly that he and Japanese employees were similarly situated because he did not plead any facts about the Japanese employees' "job function, experience, qualifications, [or] rate of pay." *Id.*, 756 F.3d at 230. The Second Circuit rejected this argument, stating:

> Brown alleges that he worked in the New Business Development
> Group with three Japanese employees, two of whom reported to
> the same supervisor as he did. Drawing all reasonable inferences in

18

Brown's favor, as we must, both Brown and the Japanese employees in the Group are plausibly alleged to be subject to the same performance evaluation and disciplinary standards, and therefore similarly situated in their employment circumstances.

*Id.*

The Amended Complaint in this case not only alleges that Plaintiff and Rosen are both psychologists assigned to P198M and P77M, who are supervised by Dr. Fleishman, but provides considerable detail regarding their circumstances. The pleading alleges that Plaintiff worked only part-time, while Rosen was full-time, but that Plaintiff was assigned more or the same number of cases as Rosen and "the most difficult ones." Amended Complaint, ¶ 19. In addition, Rosen had a bigger office which, unlike Plaintiff's, was air-conditioned and did not have to be shared with others. *Id.*, ¶ 31. Rosen also did not have to hold doors for students during fire drills, as did Plaintiff. *Id.* Thus, even if detailed allegations regarding a comparator were necessary to pleading disparate treatment, the allegations in the Amended Complaint would be more than sufficient.

### C. The Existence of Legitimate, Nondiscriminatory Reasons for Plaintiff's Termination

In the third and last of the three arguments contained in Point II of Defendant's Memo, Defendant asserts that there are legitimate, nondiscriminatory reasons for Plaintiff's termination. Defendant asserts that "survival of a motion to dismiss is only possible should plaintiff plead facts rebutting the 'legitimate, nondiscriminatory rationale [offered by the BOE for its] actions.'" Defendant's Memo, p. 18 (quoting *Terry v. Ashcroft*, 336 F.3d 128, 136 (2d Cir. 2003) (brackets added in Defendant's Memo). Plaintiff notes that there are no allegations in the Amended Complaint that rebut Defendant's proffered reasons for termination, and asserts that dismissal is therefore appropriate.

This argument fails to appreciate the distinction between a motion to dismiss and a motion for summary judgment. As noted above, an employment discrimination plaintiff need not even plead a prima facie case of discrimination. *Swierkiewicz*, 534 U.S. at 508. A plaintiff is not required at the pleading stage to anticipate what non-discriminatory reasons the defendant might proffer and to rebut those reasons in the complaint. Neither *Terry*, which involved a motion for summary judgment, nor any of the other cases cited by Defendant, suggest otherwise. Accordingly, while Defendant may wish to renew this argument upon a motion for summary judgment, Defendant cannot raise this argument upon a motion to dismiss.

### Point III: Hostile Work Environment

In Point III of Defendant's Memo, Defendant addresses Plaintiff's second cause of action, arguing that the Amended Complaint fails to state a claim for a hostile work environment. "To state a claim for a hostile work environment in violation of Title VII, a plaintiff must plead facts that would tend to show that the complained of conduct: (1) 'is objectively severe or pervasive—that is, ... creates an environment that a reasonable person would find hostile or abusive'; (2) creates an environment 'that the plaintiff subjectively perceives as hostile or abusive'; and (3) 'creates such an environment because of the plaintiff's [protected characteristic].'" *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (quoting *Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir. 2001)). Defendant contends that the facts alleged in the Amended Complaint are insufficient to show any of the three elements.

While the Second Circuit has characterized the standard for establishing a hostile work environment as "high," it has "repeatedly cautioned against setting the bar too high." *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003) (citing cases). "[T]o avoid dismissal under FRCP 12(b)(6), a plaintiff need only plead facts sufficient to support the conclusion that she was faced

with 'harassment ... of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse ....'" *Patane*, 508 F.3d at 113. In assessing the sufficiency of the pleading, a court must consider the "totality of the circumstances," and may consider such factors as "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is threatening and humiliating, or a mere offensive utterance; and (4) 'whether it unreasonably interferes with an employee's work performance.'" *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

After considering these factors and bearing in mind the caveat against "setting the bar too high," the Court concludes that the facts alleged in the Amended Complaint are sufficient to state a hostile work environment claim. As noted above, the pleading alleges that Fleishman made frequent derogatory comments about Plaintiff's accent; ended her sentences, during every conversation with Plaintiff, by saying "it's because you are Chinese"; and constantly interrupted Plaintiff during meetings and in front of colleagues, to point out the fact that Plaintiff has an accent." Amended Complaint, ¶ 10. Plaintiff contends that Fleishman did so "on purpose in order to embarrass Plaintiff," and succeeded in humiliating her. *Id.*, ¶ 11. Plaintiff was further humiliated when Dr. Fleishman required that Plaintiff, then in her third year as a school psychologist, attend bi-weekly meetings which only first-year psychologists were required to attend. *Id.*

Although none of this conduct was severe, it was allegedly accompanied by actions calculated to interfere with Plaintiff's work performance and to threaten her position. According to the Amended Complaint, Koetke moved a music class to a room next to Plaintiff's office at the beginning of the 2011-2012 school year, making it difficult for Plaintiff to work on her evaluations and to conduct meetings. *Id.*, ¶ 14. The principal not only failed to respond to

Plaintiff's complaints about this arrangement, but compounded the problem by assigning her a disproportionate number of cases and the most difficult ones. *Id.*, ¶¶ 14, 19. Fleishman then evaluated Plaintiff in a biased manner, making false statements which were later used to justify Plaintiff's termination.

These allegations, viewed together, are sufficient to support the conclusion that Plaintiff was subjected to "harassment ... of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse ....'" *See Patane*, 508 F.3d at 113; *Terry*, 336 F.3d at 148. Moreover, the Amended Complaint pleads facts supporting the conclusion that Plaintiff was being harassed because of her nationality. As noted above, most of the harassing conduct was perpetrated by Fleishman, whose repeated comments regarding Plaintiff's nationality could be construed as indicating an anti-Chinese animus. Furthermore, Plaintiff received satisfactory evaluations in 2009, 2010, and 2011, before Fleishman started evaluating Plaintiff. Amended Complaint, Second ¶ 9. After that, Plaintiff experienced a precipitous decline in her ratings. Plaintiff received satisfactory ratings with respect to 17 of the 22 items listed in the 2011-2012 evaluation, but received only three satisfactory ratings the following year. *Id.*, ¶ 25. These facts suggest that Plaintiff's termination was the result of discrimination, rather than the result of Plaintiff's suddenly deficient performance.

### CONCLUSION

For the reasons set forth above, Defendant's motion to dismiss is denied in all respects.

**SO ORDERED.**

/s/ *Sandra L. Townes*
_____
SANDRA L. TOWNES
United States District Judge

Dated: July 21, 2016
Brooklyn, New York

22